CONTINENTAL CASUALTY COMPA-
NY, a corporation, Plaintiff,

v.

UNITED STATES FIDELITY AND
GUARANTY COMPANY, et al.,
Defendants.

No. C–79–3721–WWS.

United States District Court,
N. D. California.

May 19, 1981.

William R. Friedrich, Karen O. Studley, Farella, Braun & Martel, San Francisco, Cal., for plaintiff.

David G. Leach, Leach & Schneider, San Francisco, Cal., for defendants.

SCHWARZER, District Judge.

## OPINION

Plaintiff Continental Casualty Company ("Continental") brings this action against defendant United States Fidelity and Guaranty Company ("USF&G") for breach of its duty of good faith and fair dealing. Continental contends that as a result of USF&G's failure to settle a personal injury action, Continental became liable under its excess coverage to pay $513,895 to satisfy the judgment. The action is before the Court on Continental's motion for partial summary judgment and for rulings on certain issues of law.

*FACTS*

In September 1971, Patti Martinez, a 19-year-old woman who was eight months pregnant, sustained severe and permanent brain damage when the car she was driving was struck by a car operated by Charles Moreau, a sales representative for Landtec Sales Co. who also worked as a manufacturer's representative for A. J. Gerrard & Co. At the time of the accident, Moreau was en route from a sales seminar at Landtec to Gerrard's office in San Leandro. Shortly thereafter, Mrs. Martinez gave birth prematurely to a daughter. Her husband subsequently divorced her. Unable to live alone, Mrs. Martinez and her daughter took up permanent residence with her parents.

In July 1972, Mrs. Martinez filed suit in Alameda County Superior Court against Moreau, Landtec and Gerrard, contending

that at the time of the accident, Moreau was an agent or employee acting within the scope of his agency or employment with either or both firms. She sought damages initially of $500,000, and by subsequent amendment in an unlimited amount.

Moreau was insured by California State Automobile Association for $30,000. Landtec was insured by Insurance Company of America for $100,000 and carried excess coverage of $5 million with Continental. Gerrard was insured for $200,000 by USF&G and had excess coverage of $1 million also issued by Continental.

In February 1977, the action was set for trial before a jury on May 2, 1977. On April 6, 1977, the court held a settlement conference at which Martinez' counsel Charles McCrory made a demand of $500,000 to settle the claims against all defendants. Neither USF&G nor its counsel in the Martinez case, Arthur Moore, responded to that demand. However, on April 13, Moore wrote a five-page letter to Jack Laible in USF&G's San Francisco Claims Department addressing the issue of whether respondeat superior liability for Moreau's acts could be imposed on USF&G's insured Gerrard. Moore pointed out that under current law liability no longer turned on control but on whether the accident was a foreseeable risk of the enterprise and whether the enterprise derived an incidental benefit from the activity of the putative employee or agent. He noted that this change of approach had considerably limited the scope of the previously existing exclusion from liability for accidents occurring while the employee was coming from or going to work. Although Moore was of the opinion that the court should reject liability as a matter of law, he warned that "the judicial climate may not remain the same." While believing that the case should be tried and "a properly instructed jury ... is more likely to return a defense than a plaintiff's verdict ... if a reasonable settlement were possible ... we would certainly recommend that it be seriously considered."

Five days later, on April 18, Laible (presumably after having received Moore's letter) sent a letter drafted by Moore to Gerrard notifying it that a $500,000 settlement demand had been received, that Martinez' injuries were "significant," that if a judgment were rendered for Martinez "it could be in excess of the limits of liability" under the policy, and that Gerrard "may desire to have independent counsel ... associate with them."

During the following days, Laible received from Moore a summary of the deposition of Moreau (the driver who caused the accident) noting that he will not be a "good witness either on his own behalf or on our behalf," a deposition summary of Martinez outlining at length the serious physical and mental disabilities from which she was suffering, and a report of her examination by a defense psychologist noting "severe cognitive deficits secondary to organic brain damage." On April 26, Laible and his associate raised the reserve on the Martinez case to the policy limit of $200,000, and recommended to the USF&G Home Office that the limit be offered to settle the case.

On April 28, McCrory sent Moore a new demand, proposing to settle for $400,000 of which $200,000 would be contributed by USF&G, $120,000 by Gerrard in the form of a ten-year note bearing a reasonable rate of interest, and the balance by Moreau's and Landtec's carriers paying $30,000 and $50,000 respectively (the "$320,000 demand"). McCrory pointed out that the judgment could well exceed $1,000,000.

On May 2, Moore sent copies of the demand letter to Gerrard and Laible. The latter passed the information to his supervisor Richard Babington at the USF&G Home Office, adding that "we don't have any choice but to defend now ...." Babington in response instructed Laible that USF&G would not pay more than $25,000. USF&G made no attempt to ascertain whether Gerrard was willing to contribute $120,000 or any lesser amount, or to negotiate the demand with McCrory.

On May 11, a second settlement conference was conducted by the court. USF&G

offered $50,000, Landtec's carrier offered $50,000 and Moreau's carrier $30,000. The offer was refused and no negotiations took place.

Around the time of the second settlement conference, USF&G learned for the first time of Gerrard's excess coverage with Continental. Moore promptly advised McCrory who then raised his demand back to $500,000. That demand was never withdrawn.

The case went to trial May 31, 1977. On June 14, 1977, the jury returned a verdict of $743,895 against Moreau and Gerrard. Of the judgment, Continental paid $513,895, USF&G paid $200,000 plus costs, and Moreau's carrier paid $30,000. The jury verdict was affirmed on appeal, the court finding "substantial evidence to sustain the jury's finding that Moreau was Gerrard's employee." No effort was made by USF&G to reach a settlement after verdict.

*DISCUSSION*

A. *USF&G was under a duty of good faith and fair dealing with respect to Continental.*

Under California law, which governs this diversity suit, "there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & General Insurance Co.,* 50 Cal.2d 654, 328 P.2d 198 (1958). This implied covenant imposes on the insurer a duty to settle a claim whenever there is a substantial likelihood of a recovery in excess of its policy limits. *Id.* at 659, 328 P.2d 198; *Johansen v. California State Automobile Asso.,* 15 Cal.3d 9, 123 Cal.Rptr. 288, 538 P.2d 744 (1975).

The duty to settle is founded on the conflict of interest between the insurance carrier and its insured which arises when a demand within policy limits is received. The California Court of Appeal explained the conflict in this way:

Thus, when a settlement within policy limits is offered by claimant, the previously parallel interests of the assured and carrier diverge, and a conflict of interest arises, for while it is invariably to the assured's financial interest to settle within policy limits, settlement is only to the carrier's financial interest when the relationship between settlement offer and policy limits is mathematically favorable in the light of the probabilities of winning or losing the suit.

*Merritt v. Reserve Insurance Co.,* 34 Cal. App.3d 858, 110 Cal.Rptr. 511, 518–19 (1973). Because the carrier retains the contractual right to investigate, to negotiate and to defend or settle the action against its insured, and rejection of a settlement demand may subject the insured to substantial loss, the carrier has the duty "to consider in good faith the interests of the assured equally with its own and evaluate settlement offers as though it alone carried the entire risk of loss." *Merritt, supra,* 110 Cal.Rptr. at 520. *See also Comunale, supra,* 50 Cal.2d at 660, 328 P.2d 198.

Under this rule, an insurer who fails to act in good faith in rejecting a settlement demand is liable for the entire amount of a judgment against the insured, including any portion in excess of policy limits. *Comunale, supra,* 50 Cal.2d at 660, 328 P.2d 198. The test for whether the insurer has given good faith consideration to its insured's interests is whether a prudent carrier without policy limits would have accepted the demand. *Crisci v. Security Insurance Co.,* 66 Cal.2d 425, 58 Cal. Rptr. 13, 426 P.2d 173 (1967).

Under the doctrine of equitable subrogation, the benefits of this rule accrue to the excess carrier who absorbs the loss falling on the insured as the result of the primary carrier's failure to settle. In *Commercial Union Assurance Co. v. Safeway Stores,* 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980), the court held:

Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims

against the primary carrier which the insured himself could have asserted.

*Id.* at 712, 610 P.2d 1038; *Northwestern Mutual Insurance Co. v. Farmer's Insurance Group*, 76 Cal.App.3d 1031, 143 Cal.Rptr. 415 (1978); *Valentine v. Aetna Insurance. Co.*, 564 F.2d 292 (9th Cir. 1977). Continental occupies the same position as Gerrard, USF&G's insured, had Gerrard not carried excess coverage. *Peter v. Travelers Insurance Co.*, 375 F.Supp. 1347, 1350 (C.D.Cal. 1974). It is irrelevant, therefore, whether Continental itself initiated any action to bring about a settlement.

■ Defendant's principal argument is that the duty of good faith and fair dealing never became operative in this case because no demand within policy limits was received. It relies on language in *Merritt, supra*, to the effect that a conflict of interest between the carrier and the insured arises when an offer to settle within policy limits is received, imposing a duty of good faith and fair dealing. Defendant would have the Court hold that in the absence of a demand by plaintiff within policy limits, no conflict can arise and hence the duty does not come into play.

The argument is based on a patent misreading of *Merritt*. *Merritt* recognized that it may be more advantageous to the carrier to pass up a settlement opportunity and litigate at the risk of having to pay its policy limits than to pay them voluntarily. In that situation, the carrier is obviously gambling with its insured's welfare. For that reason, *Merritt* found that a conflict of interest arises which obligates the carrier to "evaluate the settlement offer as though the carrier itself were liable for the full amount of the claim." 110 Cal.Rptr. at 521.

This kind of conflict plainly is not limited to situations in which plaintiff's demand is within policy limits. The *Merritt* court acknowledged the existence of certain obligations on the part of the carrier when a demand in excess of limits is received. When that occurs, the court said, "[o]bviously the first step is for the carrier . . . to communicate the offer [demand] to the assured." 110 Cal.Rptr. at 522. But the carrier's duty does not stop there. It has an implicit duty to inquire whether, assuming hypothetically its own willingness to pay its policy limits, the insured is willing to make the requisite contribution to bring about a settlement at a figure in excess of the policy limits. If the insured is agreeable, an obvious conflict arises between the carrier and the insured, imposing on the carrier a duty to act in good faith in deciding whether to pay its limits. The *Merritt* court summarized the applicable law as follows:

> While much remains obscure in this field of the law it is apparent from this summary that (1) the legal rules relating to bad faith come into effect only when a conflict of interest develops between the carrier and its insured; (2) a conflict of interest only develops when an offer to settle an excess claim is made within policy limits or when a settlement offer is made in excess of policy limits *and the assured is willing and able to pay the excess.*

110 Cal.Rptr. at 523–4 (emphasis added).[1] *See also Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 N.J. 474, 323 A.2d 495, 504–06 (1974).

The conduct of USF&G frustrated the purpose of the duty of good faith and fair dealing. While its attorney transmitted the $320,000 demand to Gerrard, USF&G made no effort to ascertain whether Gerrard was willing to contribute its $120,000 share of the settlement. On the contrary, on the very day on which the demand was transmitted to Gerrard, USF&G made the decision that it would not even consider the demand and would proceed to trial.[2]

---

1. The *Merritt* case itself is distinguishable on its facts for there no settlement demand whatever was received.

2. Laible's contemporary memorandum recording the events of May 2 reads as follows:

> 5/2 I received call from Jack Moore advising we have received a demand for *200,000*, our policy limits. The total demand on Gerrard is 320,000, *$120,00* [sic] payable over 10 years.

Had USF&G asked its insured whether it would contribute $120,000 (a not disproportionate contribution considering the generally acknowledged magnitude of exposure in the case) and been advised affirmatively, it would then have been in exactly the same position as though a demand within policy limits had been made. As the *Merritt* court pointed out, a demand within "feasibility limits of the assured's resources" creates a conflict of interest and would have activated USF&G's duty of good faith. 110 Cal. Rptr. at 524.

For the Court to hold that an insurance carrier can escape the duty of good faith and fair dealing by preventing the occurrence of the event which gives rise to that duty would stand the rule on its head. The most elementary notions of fairness and common sense require that a carrier at least ascertain whether its insured is willing to make the contribution required by the demand when it is defending an action in which there is a substantial risk that a verdict would exceed policy limits.[3] When the carrier fails even to attempt to do so, the demand must be presumed to be within the feasibility limits for the purpose of acti-

vating the duty of good faith and fair dealing.

The Court therefore holds that USF&G became subject to the duty of good faith and fair dealing when it received plaintiff's settlement demand of $320,000.

### B. *USF&G breached its duty of good faith and fair dealing.*

Inasmuch as USF&G was under a duty of good faith and fair dealing with respect to its insured, the question is whether the Court can determine as a matter of law that the duty was breached.

■ The duty of good faith and fair dealing does not impose a categorical obligation on a carrier to accept a settlement demand regardless of cost. But if the carrier's obligation to "evaluate the settlement offer as though the carrier itself were liable for the full amount of the claim" is to be meaningful, it must carry with it an obligation at least to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available and make an informed evaluation of the settlement demand.[4] *See Garner v. American Liability*

---

Demand on Landtec is 50,000.
Morreau [sic] his policy limits 15,000
We don't have any choice but to defend now & let the jury decide.
PM Received call from Dick Babington. They don't want us to pay more than *$25,-000.* I told him of recent develop re demand. Case will be appealed either way. JL (Laible Depo. Ex. 24)
Babington confirmed his oral instructions on May 5 by memorandum stating in relevant part:

> We have been advised that the demand against our insured is in excess of $300,-000.00—the only reply that can be made is that we do not have limits of that magnitude. The case has been one for defense and we see no reason for new instructions until and unless a most attractive proposition is presented as an alternate to going to trial. (Laible Depo. Ex. 25)

*See also* note 7, *infra*.

**3.** USF&G would place the duty of coming forward with an offer to contribute on the insured or excess carrier. To impose such a duty would make no sense since the primary carrier is in control of the litigation and the question whether a contribution is needed does not arise until after the primary carrier has at least ten-

tatively determined that it would pay its policy limits. That point was never reached in this case; to the contrary, USF&G appeared to have been careful to avoid raising this question with Gerrard. Continental's alleged unwillingness to pay any excess is therefore immaterial. *See Young v. American Casualty Co.*, 416 F.2d 906, 911 (2d Cir. 1969).

**4.** Inasmuch as USF&G declined to engage in any settlement negotiations, it made it impossible to determine whether better terms might have been available. Cases—particularly personal injury cases—generally do not settle for plaintiff's initial demand:

> The initial demand of plaintiff's counsel often will be as far removed from the actual figure acceptable in settlement as the *ad damnum* in the complaint is removed from the initial settlement demand, especially in a personal injury action. It is a matter of common knowledge that it is a rare case where exploration of the possibilities of settlement, beyond mere receipt of plaintiff's demand, will not result in some substantial reduction of the amount.

*Young v. American Casualty Co., supra*, 416 F.2d at 910–11.

*Ins. Co.*, 31 Cal.App.3d 843, 107 Cal.Rptr. 604 (1973).

■ It is not necessary to decide in this case whether the obligation to negotiate arises in the absence of a demand from plaintiff which creates a conflict of interest between the carrier and its insured.[5] The Court has heretofore determined that USF&G's conduct gave rise to a conflict of interest. Consequently USF&G had a duty to take such steps as it would have taken had it been liable itself for the full amount of any judgment.

USF&G concedes that it engaged in no negotiations after receiving either the original $500,000 or the later $320,000 demand.[6] Although, as a part of the latter demand, Martinez allocated the contributions so as to call for USF&G's policy limits and only $120,000 from its insured, USF&G did not pursue this proposition with its insured nor did it respond to plaintiff's demand. Instead it determined to go to trial, standing on its token offer of $25,000, later increased to $50,000. At the time that it did so, USF&G's claims department had recommended payment of the policy limits and had told its insured that if judgment were rendered for plaintiff it could exceed the policy limits. USF&G's counsel had advised that Moreau, the defendant driver who caused the accident, would not be a good witness, that plaintiff had suffered severe injuries and would be permanently disabled physically and mentally, and that a reasona-

ble settlement should be seriously considered.

Here then was a case in which the driver's liability was clear and the injuries and disabilities so severe that the amount of any verdict would be far in excess of the policy limits. USF&G's defense of Gerrard rested entirely on the absence of an agency or employment relation, an issue on which Moore had advised USF&G the law had been developing in a manner adverse to his position and on which it was clear a jury would favor plaintiff.

In the light of those undisputed facts, no reasonable trier of fact could find other than that USF&G's refusal to negotiate either with Martinez or with its insured to attempt to arrive at an acceptable settlement was a breach of its duty of good faith and fair dealing, i. e., that no prudent carrier without policy limits would have conducted itself in that manner. *See Garner v. American Liability Ins. Co., supra; Peter v. Travelers Insurance Co., supra; Davy v. Public National Insurance Co.*, 181 Cal. App.2d 387, 5 Cal.Rptr. 488, 495 (1960).

USF&G seeks to escape liability on the strength of the $50,000 offer it made to Martinez shortly before trial. At the time this offer was made, Martinez had learned of Gerrard's excess coverage and had raised her demand to $500,000. In view of the facts set forth in the preceding paragraphs, that offer was unreasonable as a matter of law.[7] Its unreasonableness is confirmed by

---

5. Some courts have found that a conflict, and hence a duty to negotiate for a settlement, arises whenever plaintiff's claim exceeds the policy limits, regardless of whether a settlement demand has been made. *State Auto. Ins. Co. of Columbus, Ohio v. Rowland*, 221 Tenn. 421, 427 S.W.2d 30 (1968); *Coleman v. Holecek*, 542 F.2d 532 (10th Cir. 1976) (purporting to apply Kansas Law but relying on a decision in which a settlement demand had in fact been received). Most courts, however, have predicated a duty to negotiate on receipt of a demand within either policy or feasibility limits. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 N.J. 474, 323 A.2d 495, 501 (1974); *Young v. American Casualty Co.*, 416 F.2d 906, 910 (2d Cir. 1969); *Peter v. Travelers Insurance Co.*, 375 F.Supp. 1347 (C.D.Cal.1974); *Rector v. Husted*, 214 Kan. 230, 519 P.2d 634 (1974).

6. *See note 7, infra.*

7. Although it will frequently be a question of fact whether an offer satisfies the carrier's duty of good faith and fair dealing, the record in this case permits no finding other than that USF&G's conduct was unreasonable. In reaching this conclusion the Court relies not only on the facts discussed in the previous paragraphs but on the deposition testimony of Laible:

MR. FRIEDRICH: Q. Did you ever initiate any settlement discussions with Plaintiff's counsel?
A. No.

＊ ＊ ＊ ＊ ＊ ＊

MR. FRIEDRICH: Q. To your knowledge, Mr. Laible, did any employee of USF&G ever initiate any settlement discussions with Plaintiff's counsel?

the fallacious reason given for it by Laible in his deposition, to wit, that with the disclosure of Gerrard's excess coverage, USF&G no longer had to be concerned about bad faith liability to its insured.[8] As discussed above, equitable subrogation entitles the excess carrier to the same degree of good faith and fair dealing as the insured.[9] Moreover,

> the only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer.

*Johansen v. California St. Auto Asso.*, 15 Cal.3d 9, 123 Cal.Rptr. 288, 292, 538 P.2d 744, 748 (1975). Finally, the unreasonableness of the offer is inferentially confirmed by the amount of the jury verdict ultimately rendered. *Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 17, 426 P.2d 173, 177 (1967).

### C. *Allocation of the Burden of Proof*

Inasmuch as the action must go to trial on the issue of damages, Continental has requested a ruling determining that once USF&G's breach of duty to settle in good faith has been established, Continental need only prove that it paid a judgment in excess of primary limits in order to establish a prima facie case of damages for the difference between the policy limit and the verdict amount. The burden, Continental contends, should then shift to USF&G to show either that the case could not have been settled, or that Continental was unwilling to contribute to a settlement in excess of primary limits. In the absence of any California case in point, plaintiff urges the Court to rely on *Young v. American Casualty Co.*, 416 F.2d 906 (2d Cir. 1969).

In the usual case, where an insurer acts in bad faith by refusing a reasonable settlement demand *within* policy limits, the damage to the insured is measured by the entire amount of the excess liability. *Comunale v. Traders & General Insurance Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958); *Shapero v. Allstate Insurance Co.*, 14 Cal.App.3d 433, 92 Cal.Rptr. 244 (2d Dist. 1971). That rule of damages can be applied only in a case where the evidence establishes (by proof of a demand within policy limits) that the case could have been settled without contribution by the insured or its excess carrier. Where the evidence indicates that a settlement would have required a contribution by the insured or excess carrier, any recovery must be limited to the difference between the amount that would have been contributed to the settlement and the amount ultimately paid by the insured or excess carrier in satisfaction of judgment.

The undisputed evidence in this case establishes a $320,000 demand by plaintiff, premised on a contribution by Gerrard of $120,000 and by USF&G of its policy limits.

---

8. Laible testified on deposition that, upon discovery of the excess coverage, "there was no

Q. To your knowledge, did any other employee of USF&G ever instruct Mr. Moore to initiate settlement discussions with Plaintiff's counsel?
A. Not to my knowledge.
MR. FRIEDRICH: Q. Was there a reason why you did not instruct Mr. Moore to initiate settlement discussions with Plaintiff's counsel?
A. Don't know. (Depo. Tr. 188–89; colloquy between counsel omitted; *see* note 15, *infra*)

A. Not to my knowledge.
Q. Did you instruct Mr. Moore to initiate settlement discussion with Plaintiff's counsel?
A. No, not to my knowledge.

longer the same exposure on our insured. [W]e knew there was an excess carrier so there was no concern about bad faith." (Dep. Tr. 180)

The lack of validity of that reason is corroborated by Laible's contemporary memorandum of a telephone call in June 1977 from Babington immediately after the jury verdict in which Babington "expressed concern over possible bad faith action by CNA [Continental]." (Laible Depo. Ex. 36)

9. In *Valentine v. Aetna Ins. Co.*, 564 F.2d 292, 298 (9th Cir. 1977), the court said:

> [I]f the existence of excess insurance relieved the primary insurer of its responsibility to negotiate and settle up to its policy limits in good faith, then the primary insurer would have disincentive to settlement.

Proof of that demand coupled with the proof of USF&G's breach of its duty of good faith, establishes a prima facie case by Continental for recovery of the excess it paid over the $120,000 contribution.[10]

The burden of production then shifts to USF&G to show, if it can, either (1) that no settlement could in any event have been reached because both Continental and Gerrard would have refused to make any contribution,[11] or (2) that the case would not have settled without a contribution by Continental greater than $120,000.[12] If USF&G were able to persuade the jury that no settlement could have been reached, it would be entitled to judgment. If USF&G were able to persuade the jury that Continental would have had to contribute more than $120,000, Continental's recovery would have to be reduced by the amount of the additional contribution.

Of course, it is also open to Continental to attempt to improve upon its prima facie case by offering evidence that plaintiff, after negotiations, would have accepted less than $320,000, and that the reduction would have resulted in a contribution by Continental of less than $120,000.[13]

### D. *Availability of Certain Defenses.*

#### 1. *Mitigation*

USF&G contends that Continental had a duty to mitigate damages by attempting to settle the action on its own, either before or after verdict.

In light of the Court's ruling that USF&G violated its duty of good faith, mitigation is not an issue. Moreover, with

USF&G in control of the litigation as the primary carrier, it would have been improper for the insured or excess carrier to step in and try to settle it. *See Lienemann v. State Farm Mutual Auto Fire & Casualty Co.*, 540 F.2d 333 (8th Cir. 1976), where the court, applying Nebraska law, ruled that even an insured who actively enters settlement negotiations has no duty to compromise the claim:

> An insurer may settle a claim within its limit of liability as it chooses since the insured cannot be injured by a settlement to be wholly paid by the insurer. The exclusive power to settle a claim within the limits of its liability is therefore credited to the insurer for its sole benefit. *While an insured may compromise his possible liability over and above the limits of the insurance policy, he has no duty to do so.* He may rely upon the policy, the promise to indemnify in a fixed amount, and the duty of the insurer to defend and to use its discretionary authority to settle in good faith.

*Id.* at 336, quoting *Olson v. Union Fire Insurance Co.*, 174 Neb. 375, 118 N.W.2d 318 (1962) (emphasis supplied by Eighth Circuit). *See also Northwestern Mutual Insurance Co. v. Farmer's Insurance Group*, 76 Cal.App.3d 1031, 143 Cal.Rptr. 415, 429; *Peter v. Traveler's Insurance Co., supra,* 375 F.Supp. at 1350.

Accordingly, Continental had no duty to mitigate.

#### 2. *Inequitable Conduct*

USF&G argues that Continental's claim should be barred because it failed to effect

---

10. The risk of any uncertainty, if any, as to the amount for which the case would have settled must be borne by the party whose breach of duty caused the uncertainty. *Valentine v. Aetna Ins. Co.*, 564 F.2d 292, 298 (9th Cir. 1977).

11. There is no evidence now before the Court indicating that either Continental or Gerrard took that position with respect to the $320,000 demand. A letter from Continental's claim supervisor to USF&G in May 1977 shows that Continental assigned a verdict value of $750,000 and a settlement value of $250,000 to $350,000; it did not rule out a contribution by Continental. In any event, it is difficult to see

how USF&G could sustain such a contention, having never requested a contribution.

12. Such a contention would seem to contradict squarely the express terms of Martinez' demand.

13. There is no evidence now before the Court indicating that McCrory would at any time have recommended that his client accept less than $400,000 or how a settlement in a lesser amount would have been allocated among the defendants.

a reasonable settlement or inform USF&G of its willingness to do so. For the same reasons as those applying to mitigation, the purported defense of inequitable conduct must be rejected.

 Moreover, an excess carrier has no duty to contribute to a settlement until the primary carrier's policy limits have been exhausted. *Valentine v. Aetna Insurance Co., supra,* 564 F.2d at 296; *Hellman v. Great American Insurance Co.,* 66 Cal. App.3d 298, 305, 136 Cal.Rptr. 24, 28 (1977). The California Supreme Court has rejected the proposition that the excess carrier is required to participate in the defense of a claim by contribution to the primary carrier as soon as it is notified of the claim and even though the primary insurance coverage has not yet been exhausted. *Signal Cos. v. Harbor Insurance Co.,* 27 Cal.3d 359, 165 Cal.Rptr. 799, 803–04, 612 P.2d 889 (1980). To hold otherwise, the Court stated, would make the excess carrier a coinsurer with the primary carrier with a coextensive duty to defend the insured. *Id.* 165 Cal. Rptr. at 803, 612 P.2d 889. This reasoning finds further support in *Valentine, supra,* where the court said:

> [I]f during settlement negotiations the primary insurer is allowed to force the excess insurer to cover part of the primary's insurance exposure, the coverages and rate structures of the two different types of insurance—primary and excess— would have to be adjusted.

564 F.2d at 298.

### 3. *Contributory/Comparative Negligence.*

The applicability of the principle of contributory/comparative negligence to an action for breach of the duty to settle is uncertain. *Cf. Transit Casualty Co. v. Spink Corp.,* 94 Cal.App.3d 124, 156 Cal. Rptr. 360 (1979) (adopting "triangular reciprocity" to apply comparative negligence to action for breach of duty to settle) *with*

14. *See* note 3, *supra.*

*Commercial Union Assurance Co. v. Safeway Stores,* 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980) (disapproving *Transit Casualty* in part and holding that an excess carrier's right to sue a primary carrier for wrongful refusal to settle is based on theory of equitable subrogation and not negligence). However, inasmuch as Continental had neither a duty to settle nor a duty to volunteer a contribution to a settlement in excess of primary limits, its failure to do so was not negligent in any event.[14]

### CONCLUSION

For the reasons stated, the Court concludes that Continental's motion for partial summary judgment must be granted.

The Court holds:

(1) That USF&G is liable to Continental for breach of the duty of good faith and fair dealing as a matter of law, there being no genuine issue of material fact in dispute.

(2) The only issue remaining for trial is the amount of damages to be recovered by Continental. At the trial the jury will be instructed that Continental is entitled to recover $393,895 unless Continental proves by a preponderance of the evidence that the case would have settled with a lesser contribution by Continental than $120,000, or USF&G proves by a preponderance of the evidence that the case would not have settled at all or only with a larger contribution by Continental.

(3) No evidence or instructions directed at mitigation, inequitable conduct or contributory or comparative negligence will be permitted.

The parties are directed (1) to confer forthwith concerning further proceedings in this action, including possible settlement or a stipulated judgment reserving the right to appeal, and (2) to appear for a status

conference at 10 a. m. on June 5, 1981, to discuss further proceedings, including setting of an early trial date, if necessary.

IT IS SO ORDERED.